ATTORNEY FOR APPELLANT ATTORNEYS FOR APPELLEE

Bernard G. Reisz Jeffrey A. Modisett

Evansville, IN Attorney General of Indiana

Preston W. Black

Deputy Attorney General

Indianapolis, IN

IN THE

SUPREME COURT OF INDIANA

MARK A. JENKINS, )

)

Appellant (Defendant Below), )

)

v. ) Cause No.82S00-9609-CR-600

)

STATE OF INDIANA, )

)

Appellee (Plaintiff Below). )

APPEAL FROM THE VANDERBURGH CIRCUIT COURT

The Honorable Richard L. Young, Judge

Cause No. 82C01-9511-CF-946

SHEPARD, Chief Justice.

A jury found appellant Mark A. Jenkins guilty of conspiracy to commit murder, a class A felony,
(footnote: 1) and attempted confinement, a class B felony.
(footnote: 2)  It concluded he was a habitual offender.
(footnote: 3)  The court sentenced him to fifty-five years executed time.  Jenkins appeals, claiming the evidence insufficient to support his convictions.  We affirm.

Facts

The facts most favorable to the verdict showed an unusual relationship between Mark Jenkins and Rhonda Jenkins, then Mark’s wife, and Stephanie Deffendall, the Jenkins’ neighbor.  It began on Christmas Eve 1990 when they participated in a sexually intimate threesome.  In the six years that followed, Mark and Stephanie had sexual relations on a regular basis.  They began living with one another in 1993.  Rhonda Jenkins learned of the relationship, and eventually divorced Mark in October 1994.  

Stephanie and Mark ceased living together in August 1995.  Though Rhonda did not remarry Mark, she returned to live with him in Mark’s grandfather’s home in October 1995 hoping to work things out between them.  Mark and Stephanie continued to discuss their relationship but these talks often ended in yelling arguments and Mark began to "harass" Stephanie and call her at work and home.  He once waited outside Stephanie’s work and chased her in his truck, apparently attempting to run her down.  On or about October 13, 1995, she obtained a restraining order.  

Mark became angry when he learned of the restraining order.  In one discussion with Rhonda, Mark threatened sexual mutilation against Stephanie and said, "I want to torture her."  (R. at 94.)  Several times during the month of October 1995 Mark repeated this and other threats to Rhonda, including that he wanted to kill Stephanie.   

About the time Stephanie gained the restraining order, Mark asked Rhonda to help him make copies of a Polaroid photograph which showed Stephanie performing oral sex and post them in the neighborhood.  Rhonda did not care for Stephanie and agreed to help distribute the photographs.    

In mid-October Mark asked Rhonda to try at gaining Stephanie's confidence; the two women met in a city park and at Rhonda’s place of work.  Their conversations dealt mostly with Stephanie’s desire to regain possession of the photos Rhonda and Mark had distributed. Mark spoke nightly to Rhonda about how they would "try to get her somehow without screaming, or yelling, or without waking anyone."  (R. at 97.)  On October 27, 1995, Rhonda telephoned Stephanie and told her she could pick up the photographs at the Jenkins' Elm Street residence.  Before Stephanie arrived, Mark and Rhonda had an argument.  Mark beat up Rhonda and left.  When Stephanie arrived around 11:15 p.m., she noticed that Rhonda had been beaten.  She touched Rhonda’s face and said she was sorry.  Rhonda did not know where the pictures were and told Stephanie she could not return them because Stephanie had claimed that a bodyguard was waiting for her outside.

The next day Mark told Rhonda they would "set it up for the  next weekend."  (
Id.
 at 119.)  Mark had said he wanted "it" to go from Friday night to Sunday evening.  

On October 29, 1995, Rhonda telephoned Stephanie and arranged a meeting.  Later in the day, Stephanie met Rhonda and discussed returning the photographs.  Stephanie then telephoned Mark, who offered to return the photos of Stephanie if she canceled the restraining order.  Mark and Stephanie agreed to meet later in the week to discuss the photos and restraining order further.    

On November 1, 1995, Rhonda went to the police to tell them Mark planned to kill Stephanie.  She had discussed the matter with her co-workers the day before and they had urged her to disclose Mark’s plan.  Rhonda did not go immediately to the police because she was afraid of Mark.  Rhonda had been ambivalent about Mark’s plan.  She did not care for Stephanie and was jealous of her.  She had told Mark she wanted to cut Stephanie’s hair off.  Later, she began to question Mark, asking if he was sure he wanted to go through with the plan, to which Mark replied, "I’m gonna do it with or without you."  (
Id.
 at 109.)  

The police wired Rhonda and her purse several times over the next few days, but were unable to record her conversations.  The police directed Rhonda’s actions from November 1 until Mark was arrested on November 3.

On November 2, Mark told his friend Todd Frankenberger he could not hunt with him on Friday night because he had to begin a job working for the Evansville Courier and Press.  A newspaper official later acknowledged that he interviewed Mark, but did not hire him and did not tell Mark to appear for work on that Friday.        

On November 3, Mark told Rhonda that he was preparing a basement on Claremont Street where he planned to take Stephanie after he "snatched" her.  Mark’s brother David had moved out of the home several months earlier.  Mark said he had taken a cooler of soft drinks, Jack Daniels' whiskey, sewing needles, and steel rods with bolts welded to them.  Rhonda believed Mark intended to use the needles to sexually mutilate Stephanie.  Mark also stated he would borrow a shovel and lanterns from his brother.  Later, Mark and Rhonda went to the bank, where they took out money for supplies.  After shopping, Mark carried plastic ties, a gun and other items into the Claremont residence while Rhonda drove around and then waited to pick him up.  

At about 11:15 p.m., Stephanie called Rhonda and said she would pick her up.  Mark told Rhonda how he wished to proceed.  Rhonda was to drink the Jack Daniels whiskey with Stephanie.  Mark had asked Rhonda to put on gloves, wear a thermal shirt, and pull her hair back in order to avoid leaving hair fibers or fingerprints.  At 11:30 p.m. Mark would call Stephanie’s home and ask Rhonda two questions:  Where did Stephanie’s friend George live, and would Stephanie return to the house on Elm for a sexual encounter?  Rhonda did not know why these questions were part of Mark’s plan.  Mark would tell Stephanie the photos were at the Claremont residence.  Stephanie and Rhonda would pick up Mark, drive to the Claremont residence and park across the street.  
If Stephanie screamed, Mark would choke her with his necktie while Rhonda continued to drive.  
Mark, followed by Stephanie and Rhonda, would enter the Claremont home.  Once inside, Mark would take Stephanie’s car keys, give them to Rhonda, and tell her to leave.  Rhonda was to take the car to a specific location, remove the contents of the glove box, and cover her tracks using pepper provided by Mark.  The next day Rhonda was to return to the home and cut off Stephanie’s hair.  Mark said he had two possible locations where he could bury Stephanie’s body so the police would be unable to find it.    

Stephanie picked up Rhonda and drove to Rhonda’s home, where police were waiting.  Around 11:30 p.m., Mark called and spoke to Rhonda, she told him that Stephanie answered "no" to the two questions.  Mark then spoke with Stephanie and arranged to meet on Tekoppel Avenue.  Mark told Rhonda, "we’re going to go ahead with our plan.  Make sure you put your gloves on."  (
Id.
 at 151.)  

Mark was arrested as he approached Stephanie’s car on Tekoppel Avenue.  He was carrying gloves, batteries, and a necktie.  

The police later searched the Claremont residence.  The door of the basement coal room had been modified so it could lock from either the inside or the outside.  Inside the coal room police found: a loaded gun, eye-patches, tape, wire, cable, wire ties and clips, metal hasps, a jug containing water, one-half gallon of Jack Daniels' whiskey, a bucket and roll of toilet paper, a cooler containing ice and soft drinks, screwdrivers, pliers, a hammer, a pillow, a sleeping bag and blanket, a lantern, a heater and flashlight, a ping-pong paddle, rubber gloves, various sexual devices, needles and thread, razors, tweezers, scissors, hair clippers, a knife, a lighter, a wood engraving tool, a shovel, and four steel rods with welded nuts.  Mark’s brother David, the home's last occupant, did not leave these items in the coal room.  (
Id.
 at 431-438.)

Whether the Evidence was Sufficient

In reviewing claims about the sufficiency of the evidence, we neither weigh the evidence nor judge the credibility of the witnesses.  We consider the evidence favorable to the jury’s verdict and all reasonable inferences which can be drawn from it.  If there is substantial evidence of probative value from which a trier of fact could find guilt beyond a reasonable doubt, we affirm.  
Campbell v. State
, 500 N.E.2d 174 (Ind. 1986).  Sometimes, however, we infringe upon a jury's determination of  witness credibility when confronted with "'"inherently improbable" testimony or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity."'"  
Tillman v. State
, 642 N.E.2d 221, 223 (Ind. 1994) (quoting 
Rodgers v. State
, 422 N.E.2d 1211, 1213 (Ind. 1982)).  

Mark Jenkins relies on this "incredible dubiosity" rule in arguing that the State’s evidence is insufficient to convict him.  He claims that the incriminating testimony of both Stephanie Deffendall and Rhonda Jenkins is inherently unbelievable, inherently improbable, and exhibits incredible dubiosity because of the sexual relationship that Jenkins and the two women shared.  According to Jenkins, the two women's motive to fabricate their testimony is they "were more likely than not trying to explain this bizarre relationship and their participation by placing the entire blame on the Defendant."  (Appellant's Br. At 8.)  

Jenkins's reliance on the "incredible dubiosity" rule is misplaced.  This rule does not sanction setting aside the jury’s role as factfinder simply when the facts of a case are exceedingly strange.  Here, neither the testimony of Rhonda nor of Stephanie was coerced, equivocal, or uncorroborated by other evidence.  Indeed, the testimony of each was entirely voluntary, quite definite in regard to Jenkins’ actions and statements, and corroborated by verbal testimony and physical evidence obtained from other sources by the State.  The jury’s use of the evidence given by Rhonda Jenkins and Stephanie Deffendall was therefore appropriate.

The evidence was more than sufficient to support the jury’s verdict.

We affirm the judgment of the trial court.

Dickson, Sullivan, Selby, and Boehm, JJ., concur.

FOOTNOTES
1: Ind. Code Ann. § 35-41-5-2 (West 1986); Ind. Code Ann. § 35-42-1-1 (West Supp. 1996). 

2: Ind. Code Ann. § 35-41-5-1 (West 1986); Ind. Code Ann. § 35-42-3-3 (West Supp. 1996). 

3: Ind. Code Ann. § 35-50-2-8 (West 1986).